

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :          CRIMINAL ACTION
            v.                    **FILED**
                                              NO. 07-427
DANIEL GARRAUD                    APR 2 1 2009

                                  MICHAEL E. KUNZ, Clerk
SURRICK, J.                       By_____ Dep. Clerk          APRIL _20_, 2009

## MEMORANDUM

Presently before the Court is Defendant's Pro-Se Motion to Suppress Physical Evidence.

(Doc. No. 48.)  For the following reasons, Defendant's Motion will be denied.

## I.      BACKGROUND

On July 25, 2007, Defendant was indicted on charges of armed bank robbery in violation

of 18 U.S.C. § 2113(d) and using or carrying a firearm during a crime of violence in violation of

18 U.S.C. § 924(c).  (Doc. No. 10.)  Trial is scheduled for April 27, 2009.

On September 5, 2008, Defendant filed a *pro se* Motion to Suppress Physical Evidence.

(Doc. No. 48.)  We had previously advised Defendant that we would not consider *pro se* filings

because he was represented by counsel.  (Doc. No. 38 ("All Motions must be filed by counsel.

The Court will not accept pro se motions from Defendants who are represented by counsel.").)

However, Defendant's present counsel, Christopher G. Furlong, Esq., filed a Memorandum of

Law in Support of Defendant's Motion to Suppress Physical Evidence on November 3, 2008.

(Doc. No. 60.)  The Government responded on November 18, 2008.  (Doc. No. 61.)  A

Suppression Hearing was scheduled for January 9, 2009, and the trial was scheduled for January

26, 2009.  (Doc. No. 75.)

On December 29, 2008, Defendant filed three appeals in the Third Circuit Court of

Appeals.  Prior to the scheduled January 9, 2009 Suppression Hearing, we became aware of the

fact that it was Defendant's position that this Court no longer had jurisdiction over this matter

since he had filed notices of appeal in the Third Circuit.  The Government took the position that

this Court retained jurisdiction over the matter, despite the notices of appeal.  On January 9,

2009, Defendant moved for a continuance of the Suppression Hearing.  (Doc. No. 90.)  In light of

Defendant's stated position that he was not prepared to move forward at that time, we continued

the Suppression Hearing until January 26, 2009.  (*Id.*)[1]

Following the Suppression Hearing, the Government filed a Supplemental Response to

Defendant's Motion to Suppress Physical Evidence.  (Doc. No. 105.)  Defendant filed a

Supplemental Memorandum in Support of Defendant's Motion to Suppress Evidence.  (Doc. No.

106.)  The matter is now ripe for disposition.

## II.  FINDINGS OF FACT

On July 29, 2007, Philadelphia Police Officers Jerry Velez and Richard Gregar were on

duty in Philadelphia's 8th District.[2]  (Suppression Hr'g Tr. 97-98, Jan. 26, 2009.)  While on

patrol, they heard via police radio that a bank robbery had been committed at the Bank of

America located at 14425 Bustleton Avenue.  (*Id.* at 98.)  The flash description of the bank

---

[1] Subsequently, Defendant moved formally to stay proceedings pending resolution of the Third Circuit appeals.  (Doc. No. 97.)  We denied that motion.  (Doc. No. 99.)

[2] Officers Jerry Velez and Richard Greger and Special Agents Bastian Freund and Thomas Duffy testified on behalf of the Government.  We found the testimony of these witnesses to be credible.

robber was of an armed black male, approximately five feet, six inches, medium build, wearing a

black hoodie and a surgical or painter's mask, and carrying a green bag. (*Id*. at 7, 98, 116-17.)

Moments after the original flash, the police radio also advised of the activation of a GPS tracking

device, also known as a "bloodhound."[3] (*Id*. at 98.)  Police radio advised that the bloodhound

had left the bank and was moving at approximately 35 miles per hour, indicating that the device

was in a vehicle. (*Id*. at 98-99.)  Police radio did not provide a description of the vehicle. (*Id*. at

99.)  Police radio advised that the bloodhound was proceeding northbound on Philmont Avenue,

then eastbound on Street Road, then eastbound on Old Lincoln Highway. (*Id*.)  Officers Velez

and Greger headed westbound on Old Lincoln Highway, toward Street Road. (*Id*.)  They

observed several vehicles pass them, going eastbound on Old Lincoln Highway toward Roosevelt

Boulevard. (*Id*.)  The officers pulled into a parking lot and made a U-turn, then waited and

watched as vehicles passed. (*Id*.)  Police radio advised that the bloodhound was heading

eastbound on Old Lincoln Highway toward Route 1. (*Id*. at 101.)  Moments later, the officers

observed Defendant driving a silver Acura past their position. (*Id*. at 100.)  Defendant, a black

male in a vehicle heading eastbound on Old Lincoln Highway toward Route 1, fit the partial flash

description. (*Id*. at 101.)  Defendant was the only black male in an eastbound vehicle that the

officers observed as the cars passed. (*Id*.)  Officer Velez pulled into the intersection and saw that

no other vehicles were approaching. (*Id*. at 100.)  Defendant's car stopped at a red light, behind

another vehicle that was also stationary. (*Id*. at 100, 171.)  As Officers Velez and Greger pulled

behind Defendant's vehicle, police radio advised that the bloodhound device was stopped at

---

[3] When the Bank of America bank tellers filled a bag of money for the bank robber, they
also placed two GPS devices in the bag.

3

Route 1 and Old Lincoln Highway. (*Id.* at 100.)

Based upon all of this information, the officers activated their police car's siren and emergency lights. (*Id.* at 100-01.) Officer Velez exited the driver's side of the police car, and approached the driver's side of Defendant's car. (*Id.*) Meanwhile, Officer Greger exited the passenger side of the police car and approached the passenger side of Defendant's car. (*Id.*) Officer Greger observed a bag in the back passenger seat. (*Id.* at 14.) Inside of the bag, Officer Greger could see a white dust mask along with other items. (*Id.*) He also saw the corner of a soft holster for a gun sticking out of the center rear console. (*Id.*) Defendant looked in Officer Velez's direction and put his hands up. (*Id.* at 102.) Officer Velez instructed Defendant to turn off the car, put it in park, and keep his hands up. (*Id.*) Officer Velez opened the driver's side door and instructed Defendant to step out of the car. (*Id.*) As soon as Defendant stood up, he became hostile and aggressive, asking why the officers had pulled him over and moving toward Officer Velez. (*Id.*) Officer Velez pushed Defendant back and kept his weapon drawn. (*Id.*) Officer Velez had Defendant face the vehicle, but Defendant continued moving, and asked the officers why they were violating his rights. (*Id.*) Since the radio description had advised that the bank robber was armed, Officer Velez, for safety reasons, handcuffed Defendant and placed him in the back of the patrol car. (*Id.*) Officer Velez observed that in the rear passenger side of Defendant's car was a black-and-white plastic shopping bag, folded over, and with part of a painter's mask sticking out of the top of the bag. (*Id.* at 103.) The car stop took place in Bensalem Township, just outside of Philadelphia, approximately three or four miles from the Bank of America, within about five to ten minutes after the reported robbery. (*Id.* at 103, 151.)

When FBI agents arrived at the scene of the car stop, they used a device to determine the

4

location of the GPS devices.  (*Id.* at 104.)  The GPS devices were determined to be in

Defendant's car.  (*Id.*)  Ultimately, a search warrant was obtained for Defendant's vehicle and

FBI Special Agent Thomas John Duffy, with several other agents assisting, conducted a search of

the vehicle pursuant to the search warrant.  (*Id.* at 76-78.)  Agent Duffy recovered the following

from the rear center console of Defendant's car:  a firearm with a magazine, a holster, and a set

of keys.  (*Id.* at 81-82.)  Inside of the plastic bag found on the rear passenger seat of the car,

Agent Duffy recovered a mask, a pair of surgical gloves, a dark-colored sweatshirt, and a mailing

from Fidelity Bank.  (*Id.* at 82.)  In the trunk of the vehicle, the agents found a green bag filled

with United States currency and two GPS tracking devices.  (*Id.* at 83-85.)

## III.    CONCLUSIONS OF LAW

In his Motion to Suppress, Defendant argues that the illegality of his initial stop,

detention, and arrest "tainted the information set forth in a search warrant obtained by the FBI,"

which rendered the warrant defective such that "any subsequent search by [the FBI] of

[Defendant's] vehicle and the items seized therefrom is tainted as fruits of a poisonous tree."

(Doc. No. 60 at unnumbered 7 (*citing Wong Sun v. United States*, 371 U.S. 471 (1963)).)

### A.    42 Pa. Cons. Stat. Ann. § 8953

Defendant argues that the arresting Philadelphia police officers did not have authority to

stop Defendant because they were outside of their jurisdiction in violation of the Municipal

Police Jurisdiction Act ("MPJA"), 42 Pa. Cons. Stat. Ann. § 8953.  (Doc. No. 60 at 3.)  The

Government responds that pursuant to 42 Pa. Cons. Stat. Ann. § 8953(a)(6), Officers Greger and

Velez had authority to stop Defendant outside of their primary jurisdiction.  (Doc. No. 61 at 6-7;

Doc. No. 105 at 6.)

5

Section 8953 of the MPJA governs the circumstances under which

[a]ny duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction . . . .

42 Pa. Cons. Stat. Ann. § 8953(a). Section 8953(a)(6) provides that a police officer may enforce

state laws and perform law enforcement functions outside of his primary jurisdiction "[w]here

the officer views an offense which is a felony, or has probable cause to believe that an offense

which is a felony has been committed, and makes a reasonable effort to identify himself as a

police officer." *Id.* § 8953(a)(6); *see also Commonwealth v. Phillips*, 487 A.2d 962, 964 (Pa.

Super. Ct. 1985) ("The legislature, recognizing the absurdity of territorial limitations which

require an officer . . . to stand by helplessly as suspected robbers flee, enacted 42 Pa. C.S. §

8953(a)(6) to grant police the power and authority to perform the functions of their office by

making arrests for felonies in neighboring municipalities.").

Here, there is no question that the police radio advised police officers that an armed bank

robbery had been committed. Thus, Officers Velez and Greger had probable cause to believe that

a felony had been committed. In addition, the officers were in their police uniforms, driving in a

marked police vehicle, and they conducted the car stop by pulling behind Defendant's stopped

vehicle and turning on the police car's siren and flashing lights. They clearly identified

themselves as police officers. *See, e.g., Commonwealth v. Reddix*, 513 A.2d 1041, 1044 (Pa.

Super. Ct. 1986) (finding that an arrest in Rankin Borough by Whitaker County police officers

satisfied section 8953(a)(6) where "the Whitaker officers had probable cause to believe a felony

had been committed, due to [a] radio broadcast; [and] they attempted to identify themselves as

6

police officers, and then gave chase to the vehicle in a market police car with the lights flashing and siren sounding"). Accordingly, Officers Velez and Greger had the authority, pursuant to the MPJA, to stop and arrest Defendant.

**B.    Reasonable Suspicion and Probable Cause**

Defendant also argues that the officers did not have probable cause or reasonable suspicion to stop his car in the first place. (Doc. No. 60 at unnumbered 7.) Defendant suggests that the officers "initiated their stop of [Defendant's] vehicle based on his race only," (*id.* at unnumbered 2), and that "the mere presence of the head of a black person, operating a motor vehicle, does not in and of itself arise to reasonable suspicion" (Doc. No. 106 at 5). In addition, Defendant argues that even if the officers saw "what they ultimately claimed to have seen, and in reality what they could have actually have seen, . . . [it] does not bootstrap or bolster the deficiency of the initial stopping of [Defendant's] vehicle." (Doc. No. 60 at unnumbered 7.) In response, the Government argues that Officers Greger and Velez had reasonable suspicion to conduct a *Terry* stop and probable cause to arrest Defendant and obtain a search warrant for his vehicle. (Doc. No. 61 at 9, 12-13; Doc. No. 105 at 5-6.)

*1.    Reasonable Suspicion for the Car Stop*

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (*quoting Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

In this case, prior to stopping Defendant's car, Officers Velez and Greger knew that a bank robbery had occurred minutes beforehand, mere miles from their position on Old Lincoln

Highway.  They knew that a GPS device was located in a vehicle that, according to the police

radio, was traveling eastbound on Old Lincoln Highway and would probably pass in front of

them.  And they knew that a black male, who had committed the robbery, was probably inside of

the vehicle that they were anticipating would pass them.  The officers watched as several vehicles

drove past them, but they saw no black men.  The officers then observed Defendant driving

eastbound on Old Lincoln Highway toward Route 1.  Defendant brought his vehicle to a stop and

the officers pulled behind him.  At that same time, the officers were advised that the GPS device

had stopped moving.  Taking all of this information together, Officers Velez and Greger decided

to stop Defendant's vehicle.  The officers certainly had reasonable suspicion justifying a *Terry*

stop of Defendant's car.

2.      *Probable Cause to Support the Arrest and Search Warrants*

"Police have probable cause to arrest if the circumstances are sufficient to cause a prudent

person to believe that a crime has been committed and [that] the person to be arrested committed

it." *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002).  "The information obtained as a

result of observation of an object in plain sight may be the basis for probable cause or reasonable

suspicion of illegal activity.  In turn, these levels of suspicion may, in some cases, . . . , justify

police conduct affording them access to a particular item." *Texas v. Brown*, 460 U.S. 730, 738

n.4 (1983).  Moreover, "'seizure of property in plain view involves no invasion of privacy and is

presumptively reasonable, assuming that there is probable cause to associate the property with

criminal activity." *Brown*, 460 U.S. at 741-42 (*quoting Payton v. New York*, 445 U.S. 573, 587

(1980)) (emphasis omitted).

Standing outside of Defendant's vehicle, Officers Velez and Greger observed a soft

8

holster for a gun and a painter's mask.  The officers had been advised that the bank robber used a

painter's or surgical mask during the robbery, and that he was armed.  In addition, Defendant

acted aggressively toward Officer Velez, questioning the stop and refusing to obey the officer's

instructions to remain still.  Moreover, after the stop, FBI agents arrived and determined that the

GPS devices were in Defendant's vehicle.  Accordingly, the arrest of Defendant and the search of

his vehicle did not violate the Fourth Amendment.  *Cf. Colorado v. Bannister*, 449 U.S. 1, 4

(1980) ("Standing by the front door of the car, the officer happened to see items matching the

description of some of those recently stolen in the vicinity, and observed that the occupants of the

car met the description of those suspected of the crime.  These circumstances provided not only

probable cause to arrest, but also . . . probable cause to seize the incriminating items without a

warrant.").

## IV.    CONCLUSION

For these reasons, we will deny Defendant's Motion.

An appropriate Order will follow.

BY THE COURT:

R. Barclay Surrick, Judge

9