IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07–427 |
| DANIEL GARRAUD | : | |

**SURRICK, J.**                                                                                             **AUGUST __19__, 2009**

<u>**MEMORANDUM**</u>

Presently before the Court are Defendant Daniel Garraud's Motion for Judgement [sic] of Acquittal Pursuant to Rule 29 and Motion for a New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (Doc. No. 137.) For the following reasons, the Motions will be denied.

**I.    BACKGROUND**

On July 25, 2007, a grand jury returned an indictment charging Defendant with armed bank robbery in violation of 18 U.S.C. § 2113(d) (Count One) and using or carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (Count Two). (Doc. No. 10.) On May 1, 2009, a jury returned a verdict of guilty against Defendant on both counts. (Doc. No. 126.) On May 22, 2009, Defendant filed the instant motions for post-trial relief.[1] (Doc. No.

---

[1] Although styled in part as a motion pursuant to Federal Rule of Criminal Procedure 29, Defendant's motions do not challenge the sufficiency of the evidence produced at trial. This is probably because the evidence of Defendant's guilt was overwhelming.

137.) Defendant challenges the Court's pre-trial rulings on his suppression application and his motion to dismiss for lack of a speedy trial as well as the Court's denial of his motion for a mistrial, which came in the middle of trial when a Government witness mentioned the "Bureau of Prisons."[2]

## II.     LEGAL STANDARD

### A.     Federal Rule of Criminal Procedure 29

In considering a post-verdict motion for judgment of acquittal under Rule 29, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).  The evidence must be examined as a whole in the light most favorable to the prosecution, with the presumption being that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences.  *See United States v. Iafelice,* 978 F.2d 92, 94 (3d Cir. 1992).  The verdict of the jury must be upheld unless, viewing the evidence in this fashion, no rational jury could have found the defendant guilty beyond a reasonable doubt.  *Jackson,* 443 U.S. at 319.

### B.     Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.

---

[2] The motion to suppress physical evidence was denied after hearing in a Memorandum and an Order dated April 20, 2009.  (Doc. Nos. 113, 114.)  The motion to dismiss for lack of speedy trial was denied in a Memorandum and Order dated December 17, 2008.  (Doc. No. 68.)  On December 29, 2008, Defendant filed an appeal in the Third Circuit from the Order denying his motion to dismiss for lack of speedy trial.  On July 22, 2009, the Third Circuit dismissed the appeal for lack of jurisdiction.

R. Crim. P. 33(a). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." (*Id.*) (internal quotation marks omitted). A new trial is required on the basis of evidentiary errors only when the "errors, when combined, so infected the jury's deliberation that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

### III.   LEGAL ANALYSIS

#### A.   Reasonable Suspicion to Conduct a *Terry* Stop

Defendant moves for a new trial, arguing that we made a "critical factual error" when we denied Defendant's pretrial motion to suppress. (Doc. No. 137 ¶ 17.) Defendant requests that we reconsider the suppression ruling because we made the original ruling "[w]ithout the benefit of having the ability to replay the radio transmissions nor the benefit of agreed upon transcripts . . . ." (Doc. No. 137-2 at 2.) Defendant argues that due to these alleged deficiencies "the Court made a critical error in determining the legal sufficiency for the stop of Defendant's vehicle." (Doc. No. 137 ¶ 16.) Specifically, Defendant argues that "these transmissions, which happened in a matter of seconds, undermine[] the statement of the arresting officers that they did not


proceed to approach the vehicle until they were advised that the signal from the GPS devices was showing stationary." (Doc. No. 137-2 at 3.) Defendant "requests this Court to review its prior ruling and factual determinations now that it has the benefit of having heard the radio messages again, as well as, the benefit of the transcripts, which outline specifically that which aided the listeners in their consideration of the radio calls played during the course of the trial." (Doc. No. 137 ¶ 14.)

> The Government responds that
>
>> [i]n a transparent rehashing of his pretrial arguments, [Defendant] now suggests that the availability at trial of a stipulated transcript of the 911 radio calls somehow contradicts the suppression hearing testimony of the arresting officers concerning the events leading to the defendant's arrest. This is illusion. At the suppression hearing, the audiotape of the pertinent 911 calls were played for the Court by the defendant. The tapes, which were audible and comprehensible, were the admissible evidence both at the suppression hearing and at trial. Thus, the Court was never deprived of the necessary tools to appropriately evaluate the credibility of the officers' testimony. The defendant's spin on the sequence of events preceding his arrest is not supported by either the 911 calls or the transcript.

(Doc. No. 145 at 8.)

Although Defendant attempts to frame his request for reconsideration as one that arises out of new evidence that became available during trial, in fact there has been no change that would justify our consideration of Defendant's suppression arguments for a second time. We found that the police had reasonable suspicion for the stop of Defendant's car. A review of the record amply demonstrates that this was a proper finding. The police radio transcript that Defendant attached to his motions demonstrates that at the moment that the arresting officers, who were positioned at the Interplex on Old Lincoln Highway, announce that they "got ah, an Acura eastbound on Old Lincoln Highway right now," police dispatch informs responding

officers that the GPS signal is "now in the area of Old Lincoln Highway at the Interplex." (Doc. No. 137-3, Ex. A at 5-6.) Immediately thereafter, police dispatch reports: "We're showing it's right at the Interplex, on Old Lincoln Highway, in the area of the Interplex." (*Id.* at 6.) Even if one were to accept Defendant's contention that there was a question concerning the officers' testimony as to the time line of events, the officers nevertheless had reasonable suspicion to stop Defendant's car. The police officers knew that the bank robber was a black male. Defendant was driving his car on Old Lincoln Highway at the Interplex. The arrested officers were stationed at the Interplex. The GPS devices that had been hidden in the money by the bank tellers identified the bank robber as being at the Interplex. Defendant was the only black male driver driving a motor vehicle at the Interplex at that time. Defendant's motion for a new trial based upon the assertion that the *Terry* stop was not based on reasonable suspicion is frivolous.

      B.      **Speedy Trial Rights under the Sixth Amendment**

Next, Defendant asks that we also reconsider our ruling on Defendant's pretrial motion to dismiss the indictment based on alleged speedy trial violations. Defendant contends that "[a]lthough Defendant's argument was based primarily on violation of 18 U.S.C. § 3161(c), Defendant included as a basis for his dismissal the violation of his Sixth Amendment right to a speedy trial" (Doc. No. 137 ¶ 23), but that "[t]he Court did not directly address, in its Memorandum, that aspect of Defendant's claim" (*id.* ¶ 24). Defendant argues that the delay of "almost twenty-two (22) months . . . from the date of Defendant's arrest until the actual trial of the matter at hand" prejudiced him and violated his speedy trial rights under the Sixth Amendment. (Doc. No. 137-2 at 4.) "Defendant, avers that upon the Court's review of a specific Sixth Amendment violation, it would find that Defendant's rights, under that

Amendment, had been violated and as such the Indictment should have been dismissed." (Doc. No. 137 ¶ 25.)

The Government responds that Rule 29 is not an appropriate mechanism to raise a Sixth Amendment speedy trial rights challenge, that Defendant has not previously complained about the twenty-two month delay, that Defendant has only challenged a particular delay that amounted to approximately six months, and that Defendant has failed to "allege any specific prejudice he sustained as a result of what amounted to a six-month delay in the trial . . . ." (Doc. No. 145 at 7.)

Defendant's pretrial motions challenging pretrial delays were brought under the Speedy Trial Act alone, not the Sixth Amendment. The only mention of the Sixth Amendment appeared in Defendant's *pro se* motion, which, after an extended discussion of excludable time under the Speedy Trial Act, stated that Defendant moved to dismiss the indictment "due to violation of the Sixth Amendment Constitutional Right." (Doc. No. 47 ¶ 7.) In an Order dated July 22, 2008, we notified Defendant that we would not accept *pro se* motions because he was represented by counsel. (*See* Doc. No. 38 ("All Motions must be filed by counsel. The Court will not accept pro se motions from Defendants who are represented by counsel.").) Defense counsel, Christopher G. Furlong, Esq., endeavoring to properly represent his client, filed a Memorandum of Law in Support of Defendant's *pro se* Motion to Dismiss for Lack of Speedy Trial. (*See* Doc. No. 59.) Defense counsel's memorandum focused exclusively on the Speedy Trial Act, the Court's granting of an open-ended continuance, and the time period between September 13, 2007, and May 8, 2008. (*Id.*) For Defendant to now suggest that the Court neglected to address his speedy trial claims under the Sixth Amendment is disingenuous.

In any event, Defendant's Sixth Amendment argument fails. The Sixth Amendment provides in pertinent part that "in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. Const. amend VI. To determine whether the Sixth Amendment speedy trial clause has been violated, we weigh: "(1) the length of the delay, (2) reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant." *Burkett v. Fulcomer*, 951 F.2d 1431, 1438 (3d Cir. 1991) (citing *Barker v. Wingo*, 407 U.S. 514, 517-38 (1972)). "All factors must be considered and weighed as no one factor is dispositive or 'talismanic.'" *Hakeem v. Beyer*, 990 F.2d 750, 759 (3d Cir. 1993) (quoting *Barker*, 407 U.S. at 533). "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530-31.

There was a period of approximately twenty-two months between Defendant's arrest on July 2, 2007, and the commencement of trial on April 27, 2009. We will therefore consider Defendant's case in light of the remaining *Barker* factors. *See United States v. Degrasse*, 258 Fed App'x 485, 487 (3d Cir. 2007) (non-precedential opinion) ("We assume, without deciding, that the 22-month delay in sentencing is sufficiently lengthy to warrant consideration of the other three [*Barker*] factors.").

        1.      *Reason for Delay*

"'Deliberate attempts to delay the trial in order to hamper the defense should be weighted heavily against the government.'" *Hakeem*, 990 F.2d at 766 (quoting *Barker*, 407 U.S. at 531). "Neutral reasons such as negligence . . . [will] be weighed . . . against the government, but less heavily absent 'any showing of bad faith or dilatory purpose by the prosecution." *Id.* (internal

quotation marks omitted). "Conversely, however, delays attributable to the dilatory actions of the defendant cut against a finding of a Sixth Amendment violation." *Id.*

The delay in this case resulted entirely because of the actions of Defendant and defense counsel. Clearly, this factor weighs strongly against Defendant. Defendant was arrested on July 2, 2007, indicted on July 25, 2007, and arraigned on August 29, 2007. Several days before the arraignment, defense counsel filed a request for a 60-day continuance. (*See* Doc. No. 14 (requesting that the case be continued "for a period not to exceed sixty days from September 17, 2007").) We granted the continuance request. As we noted in the December 17, 2008 Memorandum and Order, "[d]uring the next several months, the parties exchanged discovery and engaged in plea negotiations." (Doc. No. 68 at 3.) During this period, Defendant complained to the Court about a lack of communication with defense counsel. However, defense counsel advised the Court on a regular basis that plea negotiations were ongoing and requested that trial not be scheduled so that the negotiations could continue. In April 2008, defense counsel advised that the plea negotiations were completed and requested that a change of plea hearing be scheduled. Notice of a change of plea hearing was sent to counsel on May 8, 2008, scheduling the hearing for May 23, 2008. On May 20, 2008, the Government filed a Change of Plea Memorandum. The change of plea hearing was then continued to June 6, 2008. At that time, Defendant requested a continuance so that he could review the notes of testimony of the probable cause hearing. We granted the request and scheduled trial or a plea hearing for June 23, 2008. Defendant wrote to the Court on June 18, 2008, asking for a new attorney. At a status hearing on June 20, 2008, we granted Defendant's request for a new attorney and continued the matter again. (*See* Hr'g Tr., June 20, 2008.) The Government advised that two FBI agents who were

prepared to testify if the trial began as scheduled on June 23, 2008, would not be available if the trial were continued by one month because they were leaving for three-month tours of duty in Iraq on July 4, 2008.  (*Id*. at 16-17.)  When we explained to Defendant that we would have to continue the case beyond thirty days, Defendant responded, "Yeah.  I have no problem with the speedy trial . . . ."  (*Id*. at 18.)  We scheduled trial for November 10, 2008.  During the intervening months, Defendant filed several *pro se* motions, despite our admonition against such filings and despite being represented by new counsel.  Defendant then sought to have his new attorney removed from the case.  We therefore held a status hearing.  During the status hearing, Defendant agreed that counsel could continue to represent him.  However, Defendant also requested that expert witnesses examine the Government's evidence.  This necessitated continuance of the trial from November 10, 2008, to January 26, 2009.  As the new trial date approached, Defendant filed more pretrial motions, sought to obtain DNA and GPS experts, moved to continue the trial to give those experts time to analyze evidence, and appealed several of the Court's Orders.  Defendant also moved to stay court proceedings, including the trial, while Defendant's appeals were pending in the Court of Appeals for the Third Circuit.  We granted Defendant's motion to continue the trial and rescheduled it for April 27, 2009.  We denied Defendant's motion to stay.

      Clearly, the delay in this case has resulted from Defendant's own actions.  Defendant clashed with several attorneys, necessitating status hearings and further continuances.  His attorney entered into plea negotiations with the Government, but at the hearings that followed, Defendant advised that he wanted to go to trial and wanted a new attorney.  Newly-appointed counsel sought trial continuances so that he could retain DNA and GPS expert witnesses and so

that he could properly prepare for trial. The second *Barker* factor weighs against Defendant.

        2.     *Defendant's Assertion of his Right*

Although Defendant nominally asserted his Sixth Amendment speedy trial rights, this factor carries only minimal weight in Defendant's favor. "Where, through contrary actions, a defendant evidences an unwillingness to commence with the trial requested, the request carried minimal weight." *Hakeem*, 990 F.2d at 765; *see also id.* (finding that the weight to be given to the defendant's request for a speedy trial was "reduced by his apparent unreadiness to proceed to trial at any of the times he asserted the right"). Defendant complained to the Court about speedy trial delays, but at every opportunity he sought continuances for trial preparation. The Court and the Government were prepared to proceed to trial on May 23, 2008, but because of Defendant's actions, trial did not commence until April 27, 2009.[3] Defendant even sought to stay trial proceedings during the pendency of the appeals that he filed in the Third Circuit Court of Appeals. If we had granted Defendant's motion to stay, Defendant would still be in pretrial detention, awaiting trial. Accordingly, Defendant's nominal assertion of his speedy trial rights carries minimal weight.

        3.     *Prejudice to Defendant*

"Various types of prejudice can result from a pretrial delay: oppressive pretrial incarceration, the accused's anxiety and concern over the outcome of the litigation or impairment of the defense, including general concern over the delay's effect on the reliability of the truth

---

[3] A more detailed recitation of the various motions, hearings, and continuances that took place in this matter can be found in the Court's Memorandum Opinion denying Defendant's motion to dismiss the indictment for lack of a speedy trial. *See United States v. Garraud*, No. 07-427, 2008 U.S. Dist. LEXIS 102471 (E.D. Pa. Dec. 17, 2008).

finding process." *Hakeem*, 990 F.2d at 760. "With respect to all its various types, the burden of showing prejudice lies with the individual claiming the violation . . . ." *Id.*

Here, Defendant argues that "his continual pre-trial detention of a period of twenty-two (22) months, in and of itself, was oppressive. One can only imagine the harm as to the denial of their personal liberty, loss of employment and disruption of everyday life activities." (Doc. No. 137-2 at 5.) Being detained pretrial for many months is not *per se* oppressive. *See Hakeem*, 990 F.2d at 761 ("We do not think pretrial incarceration of either thirteen or fourteen and one-half months demonstrates per se oppressive pretrial delay."). As discussed above, the majority of the twenty-two month pretrial delay was caused by Defendant. Having requested continuances and having caused delays in scheduling the trial, Defendant is not now in the position to complain that these delays prejudiced him by requiring him to remain incarcerated prior to trial. Indeed, as mentioned above, Defendant would still be in the allegedly oppressive pretrial detention if the Court had granted his motion to stay. Finally, Defendant is facing a guidelines sentence for armed bank robbery of at least 46 to 57 months, plus a mandatory minimum consecutive sentence for brandishing a firearm of seven years. He will receive credit for all of the time that he has served. *See Hakeem*, 990 F.2d at 762 (finding that "credit for time served mitigates the potential oppressive effects of . . . incarceration") (quotation marks omitted).

Defendant also argues that "[a] delay, in and of itself, caused the Defendant hardship in subsequently trying to prepare for trial, when a year of little or no activity by his then counsel in dealing and evaluating or even discussing the contents of the Government's case with the Defendant." (*Id.* at 5-6.) Defendant's concern in this matter clearly is not the allegedly time-sensitive nature of Defendant's trial preparation. It was Defendant who caused the trial to be

11

continued for almost a whole year after appointment of new defense counsel.  Defendant's concern appears now, as it did then, to be directed mainly to the dissatisfaction with defense counsel's representation.  Allegations of inadequate representation, however, do not demonstrate prejudice to Defendant under the speedy trial clause.  Defendant has pointed to no evidence of "specific prejudice flowing from the delay." *Hakeem*, 990 F.2d at 762.  We find that the fourth *Barker* factor weighs against Defendant.

Since Defendant caused most of the delay in this case, was not ready to proceed to trial when he asserted his speedy trial rights, and was not prejudiced by pretrial delay, we conclude that Defendant's Sixth Amendment speedy trial rights were not violated in this matter.  Defendant is not entitled to have the indictment dismissed, or to a judgment of acquittal, or to a new trial under the speedy trial clause.

        **C.**      **Motion for New Trial Based Upon Agent McQueen's Comment**

Finally, Defendant moves for a new trial based on a comment made by a Government witness at trial.  The Government called FBI Special Agent Steven McQueen, who is assigned to the Violent Crimes Task Force, to testify about collecting evidence from Defendant pursuant to a search and seizure warrant for Defendant's DNA.  (Trial Tr. 48-50, Apr. 29, 2009.)  After some introductory testimony concerning Agent McQueen's background and training in evidence collection, AUSA Mary Kay Costello began questioning him about the process of DNA collection.  (*Id.* at 52.)  The following exchange took place:

    Q:    Could you just sort of explain what you do –

    A:    Yes

    Q:    – or what you did do?

> A: First thing that would happen, we – once we're over at the Bureau of Prisons[4] and we make contact with the subject of the –
>
> Mr. Furlong: Objection. Can we see you at sidebar, please?

(*Id.*) At sidebar, defense counsel moved for mistrial on the grounds that the witness mentioned the Bureau of Prisons. (*Id.*) AUSA Andrea Foulkes stated that she had not heard the witness make such a statement. (*Id.*) AUSA Costello confirmed that the witness mentioned the Bureau of Prisons, but noted that it was not in response to her question and that it was not prejudicial or cause for a mistrial. (*Id.*) Defense counsel's request for a mistrial was denied. We asked defense counsel if he wanted the jury to be cautioned to disregard Agent McQueen's statement. (*Id.*) Counsel requested a cautionary instruction. We gave the following instruction: "Ladies and gentlemen, you are cautioned to completely disregard the last comment by the witness, the last statement by the witness. Do not consider it. Erase it from your memory." (*Id.* at 53.) After the Court's instruction, Agent McQueen proceeded to testify about the DNA test collection process that he followed with Defendant. (*Id.*)

> Defendant now argues that he is entitled to a new trial because
>
> [i]n reference to the Defendant being continually incarcerated only heightened the jury's awareness that the Defendant was considered a dangerous individual who had to maintained [sic] in prison pending trial. Even if the jury did not make that deduction, most assuredly the fact that somebody was in jail has nothing positive to add and can only be detrimental.

(Doc. No. 137-2 at 7.) Defendant also argues that "[w]ith a constant reminder that all the agents involved were part of the Violent Crimes Taskforce [sic], this statement was just another differential dumping on Defendant and his situation." (*Id.*)

---

[4] Defendant was housed pretrial and during trial at the Federal Detention Center in Philadelphia.

The Government responds that Agent McQueen's remark did not prejudice Defendant and that "[s]uch a *de minimus* reference to a detention facility site to conduct a scientific test does not, necessarily, suggest to a lay juror that the defendant was in custody at all, let along [sic] 'continually incarcerated' . . . ." (Doc. No. 145 at 13.) Moreover, the Government argues that "[i]n light of the overwhelming, uncontradicted evidence supporting the defendant's guilt, this isolated, unsolicited remark does not warrant the granting of a new trial." (*Id.* at 14 (citing *United States v. DiPasquale*, 740 F.2d 1282 (3d Cir. 1984)).)

"When evaluating whether a prosecution witness made prejudicial remarks, a court must examine '(1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury, (2) the strength of the other evidence, and (3) curative action taken by the district court.'" *United States v. Davis*, 397 F.3d 173, 180 (3d Cir. 2005) (quoting *United States v. Xavier*, 2 F.3d 1281, 1285 (3d Cir. 1993)). Courts must "'normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented [to it].'" *Id.* at 181 (quoting *United States v. Fisher*, 10 F.3d 115, 119 (3d Cir. 1993)). The Third Circuit has therefore held that "the proper remedy for incorrect admission of evidence is an instruction to disregard." *Id.* at 181 (citing *United States v. Newby*, 11 F.3d 1143, 1147 (3d Cir. 1993)). However, where the

> potential prejudice is such that there is inherent danger that jurors, in determining the issues, may be unable or unwilling to erase from their minds that which has improperly come to their attention, no instructions or admonitions by the trial judge will suffice. The only appropriate remedy in such a situation is to declare a mistrial.

*United States v. Carney*, 461 F.2d 465, 467-68 (3d Cir. 1972).

Here, cautioning the jury rather than granting a mistrial was entirely appropriate. Agent

14

McQueen's stray remark represented a solitary, and clearly inadvertent, mistake in what was otherwise routine testimony about the collection of evidence. Contrary to Defendant's assertions, Agent McQueen's statement – "once we're over at the Bureau of Prisons" – would not necessarily lead a jury to believe that Defendant was being "continually incarcerated" or being detained pretrial because he was a "dangerous individual." The likely prejudice from this statement ranges from none to minimal. The witness's remark was not pronounced or persistent. In fact, AUSA Foulkes, who was sitting at counsel table, did not even hear it. Moreover, there is no reason to believe that the jury would have concluded anything other than that the Bureau of Prisons was simply a neutral meeting ground for the evidence collection to take place. At the very most, the jury could have concluded that Defendant was detained pretrial because he was charged with a serious crime, armed bank robbery. The jury was instructed several times nevertheless that the charges against Defendant were not evidence against him but were merely accusations.

However, even if the jury did follow the chain of deductions posited by Defendant, the prejudice to Defendant was minimal in the context of the overwhelming evidence against Defendant. Among other things, the Government offered evidence that Defendant was stopped and arrested less than ten minutes after the bank robbery, within four miles of the bank, in possession of the stolen money, the GPS devices that the bank tellers had hidden in the money, a handgun, and the clothing and accessories worn by the bank robber. The Government showed surveillance video of the bank robbery and demonstrated that each item of clothing worn by the bank robber was found in Defendant's vehicle. Furthermore, some of the items worn by the bank robber – such as a mask, hoodie, and gloves – were found inside of a plastic bag that also

contained mail addressed to Defendant. DNA testing showed that DNA evidence from dust mask was a complete match with Defendant's DNA, while the gloves, hoodie, and a Phillies hat (also worn by the bank robber and found in Defendant's car) were consistent with Defendant's DNA. Moreover, the gun used in the bank robbery resembled the gun found in Defendant's car.

Finally, we gave a curative instruction to the jury to disregard the statement made by the witness. Defense counsel requested the instruction, although he was reluctant to draw attention to Agent McQueen's remark:

> The Court:    Are you requesting any – I'm going to deny your request for a mistrial. Do you want me to caution the jury to disregard?
>
> Mr. Furlong:  I'm going to have to. Unfortunately, that only highlights the fact that he said it.
>
> The Court:    Well, you either want me to or you don't, Mr. Furlong.
>
> Ms. Costello: I'd ask that you not. I believe it would draw attention to it.
>
> The Court:    It's entirely up to you.
>
> Mr. Furlong:  I understand.
>
> The Court:    What do you want me to do?
>
> Mr. Furlong:  Give the instruction, please.
>
> The Court:    All right.

(Trial Tr. 52-53, Apr. 29, 2009.) We instructed the jury as requested and must presume that the jury followed the instruction. In light of our curative instruction, the isolated nature of the remark, and the overwhelming evidence of Defendant's guilt, we are satisfied that our denial of Defendant's motion for a mistrial was proper. *See United States v. Anthony*, 145 Fed App'x 261, 269 (10th Cir. 2005) (non-precedential opinion) (finding that where a witness testified to

receiving a letter from the defendant "from the detention center" and defense counsel moved for a mistrial because the jury had been informed that the defendant was in custody, no mistrial was required because "the improper testimony was inconsequential on the jury's verdict in light of the other evidence of his guilt"); *United States v. Brown*, 903 F.2d 540, 542 (8th Cir. 1990) (finding that there was minimal danger of prejudice and affirming district court's denial of motion to dismiss charges where prosecutor asked a question that informed the jury of the defendant's pretrial detention because there was strong evidence against the defendant, the improper question was an isolated incident, and the trial judge gave a curative instruction).

      We reject Defendant's contention that he was prejudiced by the testimony of FBI agents who referred to their assignments with the Violent Crimes Task Force.  Defendant argues that the name of the task force reflects badly on Defendant, presumably because it associates him with violent crime.  Each FBI agent called as a Government witness testified about the nature of his duties as a member of the Violent Crimes Task Force.  For example, Agent McQueen testified: "I handle cases and investigate cases involving bank robberies, commercial store robberies, fugitives, any of the violent crimes that happen in Philadelphia that we choose to adopt and investigate."  (Trial Tr. 48-49, Apr. 29, 2009.)  The jury was well aware that Defendant had been charged with a violent crime, that is, armed bank robbery.  The fact that Defendant's alleged criminal activities were investigated by a task force called the Violent Crimes Task Force is no surprise and certainly was not prejudicial.  The jury found Defendant guilty of armed bank robbery because of the overwhelming evidence that he committed that violent crime, not because the jury learned that the FBI agents who investigated his case were members of a task force that targeted violent crime.  Accordingly, we find that there has been no "miscarriage of justice" that

would entitle Defendant to a new trial.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motions will be denied.

An appropriate Order will follow.

<div style="text-align: right;">
BY THE COURT:

_____
R. Barclay Surrick, J.
</div>

Case 2:07-cr-00427-RBS   Document 148   Filed 08/19/09   Page 19 of 19